J-S54030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROY MICHAEL HOGAN, JR. | : | |
| | : | |
| Appellant | : | No. 474 MDA 2019 |

Appeal from the Judgment of Sentence Entered March 13, 2019
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s): CP-54-CR-0000616-2018,
CP-54-CR-0000617-2018

BEFORE: BOWES, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.: **FILED AUGUST 10, 2020**

Roy Michael Hogan, Jr., appeals from the judgment of sentence, entered in the Court of Common Pleas of Schuylkill County, after a jury convicted him of numerous offenses, including two counts each of attempted murder[1] and aggravated assault.[2] Upon careful review, we affirm.

The trial court aptly summarized the factual background of this matter as follows:

_____

[1] 18 Pa.C.S.A. § 901(a).

[2] 18 Pa.C.S.A. § 2702(a)(1).

Hogan was also convicted of two counts each of terroristic threats, 18 Pa.C.S.A. § 2706(a)(1), possessing instruments of crime ("PIC"), 18 Pa.C.S.A. § 907(a), and criminal trespass, 18 Pa.C.S.A. § 3503(a)(1)(i), as well as one count each of burglary, 18 Pa.C.S.A. § 3502(a)(1)(i), simple assault, 18 Pa.C.S.A. § 2701(a)(3), and four counts of recklessly endangering another person ("REAP"), 18 Pa.C.S.A. § 2705.

Brooke Ditzler and Hogan had been in a two[-]year[-]long romantic relationship, which she ended in the summer of 2017. By March of 2018[, Ditzler] was seeing Michael Seltzer. On March 17, 2018, Ditzler and Seltzer were out with two of their friends, Mallory Geiger and Andrew Matlock. They were celebrating St. Patrick's Day by visiting several bars in the City of Pottsville. Hogan was present at one of those bars and saw Ditzler with Seltzer.

After leaving the bar, the two couples went to a diner in the Borough of Schuylkill Haven to eat. They stayed for about an hour before going to Ditzler's house, which was nearby. When they arrived at the house, the women went upstairs to Ditzler's bedroom to change. They were startled to discover Hogan lying on the bed. He was staring at the ceiling, with his hand across his chest[,] and holding a pocketknife.

Ditzler screamed and the women ran downstairs. Ditzler called the police. Hogan came down behind them. He was not then carrying the knife. Ditzler told her companions to hold Hogan there for the police. Matlock pinned him against the wall. As he did so, the knife fell from Hogan's jacket, and Matlock backed away. Hogan then calmly walked out the front door.

Ditzler had locked the front and back doors to her house before leaving that evening, and she had the only key, which she used to unlock the front door when the couples arrived. There was also a side door to the basement. [I]t was kept locked, but it had a doggie panel that was just covered in plastic.

The police soon arrived and searched the area for Hogan to no avail. The two couples decided to stay at Ditzler's home that night and to sleep together in the living room for safety. After making sure the doors were locked, they went to sleep. Matlock slept in the recliner. The other three slept on the couch with Seltzer closest to the front door and Ditzler in the middle.

Sometime during the night, Hogan returned to the residence. He gained entry through the basement door. Once in the living room, Hogan stabbed Seltzer eight times, once in the temple area, twice in his che[e]k, twice on his right arm, once in the left shoulder area, once in the [] chest, and once in the abdomen. [Seltzer] had been asleep before the stabbing, and when he awoke, he had lost control of his right arm and was bleeding profusely.

- 2 -

Next, Hogan stabbed Matlock in the neck, near the carotid artery. Mat[l]ock was able to get out of the chair and run into the adjo[i]ning dining room with Hogan in pursuit. Matlock used the dining room chairs to defend himself. When he hit Hogan with a chair, Hogan was stunned enough for Matlock to run back into the living room, where he grabbed Seltzer and helped him out the front door. Outside, Matlock was able to pound on a neighbor's door until the neighbor awoke and called the police. While this was occurring, Ditzler was calling 911 on her cellphone.

After Matlock and Seltzer left, Hogan closed and locked the front door and turned his attention to Mallory Geiger, who was still sitting on the couch. He punched her hard in the chest before swiping the knife at her and cutting her chest. Ditzler [r]an over and pushed Hogan away. He pushed her back, knocking her to the floor. Geiger dropped to the floor and crawled to Ditzler. Both women were sitting on the floor near the door, screaming for help. Hogan went to Geiger and, while holding a knife to her chin, told her: "This is your last chance or I'm going to kill you." Geiger stood up and started to walk toward the kitchen with Ditzler holding onto her leg and screaming for Geiger not to leave.

After Geiger went into the kitchen, Hogan approached Ditzler and stood over her holding a knife to her face. At that moment, the police began banging on the door, which Ditzler reached up and unlocked. As an officer entered, Hogan ran past Geiger in the kitchen and out the back door. He was eventually spotted by a neighbor and apprehended without further incident.

Trial Court Opinion, 5/8/19, at 1-4.

Hogan was tried on February 11-14, 2019, after which a jury convicted him of the above-stated offenses. On March 13, 2019, the court sentenced Hogan to an aggregate term of 35 to 70 years' incarceration. Hogan did not file post-sentence motions. He filed a timely notice of appeal,[3] followed by a

---

[3] Hogan was charged at two separate docket numbers, but filed only one notice of appeal listing both docket numbers. The Official Note to Pennsylvania Rule of Appellate Procedure 341 provides as follows:

> Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed. **Commonwealth v. C.M.K.**, 932 A.2d 111, 113 & n.3 (Pa. Super. 2007) (quashing appeal taken by single notice of appeal from order on remand for consideration under Pa.R.Crim.P. 607 of two persons' judgments of sentence).

Pa.R.A.P. 341, Official Note.

In **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), our Supreme Court construed the above language as constituting "a bright-line mandatory instruction to practitioners to file separate notices of appeal." **Id.** at 976-77. Therefore, the **Walker** Court held that "the proper practice under Rule 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." **Id.** at 977. The Court tempered its holding by making it prospective only, recognizing that "[t]he amendment to the Official Note to Rule 341 was contrary to decades of case law from this Court and the intermediate appellate courts that, while disapproving of the practice of failing to file multiple appeals, seldom quashed appeals as a result." **Id.**

Subsequently, this Court, in **Commonwealth v. Creese**, 216 A.3d 1142 (Pa. Super. 2019), read **Walker** "as instructing that we may not accept a notice of appeal listing multiple docket numbers, even if those notices were included in the records of each case." **Id.** at 1144. Accordingly, **Creese** held that "a notice of appeal may contain only one docket number." **Id.**

More recently, in **Commonwealth v. Johnson**, 2020 PA Super. 164 (Pa. Super. filed July 9, 2020) (en banc), this Court held that, in requiring notices of appeal to contain no more than one docket number, **Creese** "imposed upon appellants an additional requirement found in neither **Walker** nor Rule 341." **Id.** at *12. Accordingly, the Court held that, where an appellant otherwise complies with the dictates of **Walker**, "in so far as **Creese** stated a notice of appeal may contain only one docket number, that pronouncement is overruled." **Id.** (internal citation and quotation marks omitted).

Here, Hogan's single counseled notice of appeal, referencing two docket numbers, was filed in the Schuylkill County Court of Common Pleas on March 20, 2019, more than nine months after **Walker** was issued. However, Hogan's appeal relates to only one of the docket numbers listed on his notice of appeal. Accordingly, Hogan is in compliance with **Walker**'s dictate that

court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Hogan raises the following claims for our review:

> 1. Did the [t]rial [j]udge commit an error of law/abuse of discretion in ruling during the [m]otion *in* [*l*]*imine* hearing prior to trial that [Hogan] was prohibited from testifying or arguing about how the alleged victim's . . . decision to abort his child affected him, which testimony would have added to the credibility of his claim that he had become suicidal by March 18, 2018?

> 2. Did the [t]rial [j]udge commit an error of law and/or an abuse of discretion in ruling during the trial that general references to a [protection from abuse ("PFA")] order and a [b]ail [o]rder pertaining to [Hogan] and existing on March 18, 2018 were admissible?

> 3. Did the [t]rial [j]udge commit an error of law in failing to dismiss two [c]ounts of [c]riminal [a]ttempt to [c]riminal [h]omicide . . . after a [m]otion was made by [Hogan] at the conclusion of the Commonwealth's case-in-chief for dismissal based on the offenses being incorrectly defined in the [i]nformation?

Brief of Appellant, at 4-5.

Hogan's first two claims concern evidentiary rulings by the trial court. The admission of evidence is within the sound discretion of the trial court, and a trial court's evidentiary rulings will be reversed only upon an abuse of that discretion. *Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest

_____

requires a separate notice of appeal for each lower court docket challenged on appeal. We, therefore, decline to quash Hogan's appeal on the basis of **Walker**. **Johnson**, **supra**.

unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Commonwealth v. Dillon***, 925 A.2d 131, 136 (Pa. 2007).

Hogan first asserts that the trial court erred in precluding him from testifying about the fact that Ditzler had aborted his child and the manner in which that abortion had affected him. At trial, the theory of Hogan's defense was that he did not have the intention to commit homicide when he broke into Ditzler's residence. Rather, he intended to "confront Ditzler and talk to her about the break-up of their relationship and its aftermath." Brief of Appellant, at 12. Hogan claims he knew that the police would be called and, upon seeing him with a knife, would shoot to kill him. Hogan argues that his true intent was to commit "suicide by cop" in front of his former paramour. Hogan claims that testimony regarding Ditzler's abortion and its impact on his mental state would have lent credibility to his claim that he was suicidal on the date of the incident in question.

Prior to trial, the Commonwealth filed a motion *in limine* seeking to preclude the introduction of evidence of the abortion as inadmissible bad character evidence relating to the victim. The trial court concluded that the abortion, which occurred ten months prior to the incident, was "far removed in time from the incidents giving rise to the trial and would in no way relate to Hogan's state of mind and intent when he stabbed Seltzer, Matlock, and Geiger." Trial Court Opinion, at 5. The court further found that Hogan's sole purpose in introducing the evidence was to "disparage Ditzler before the jury."

*Id.* Accordingly, the trial court granted the Commonwealth's motion and precluded the defense from any mention of Ditzler's abortion.

Despite the court's ruling, Hogan testified as follows during his direct examination:

> Q: All right. Now, at the time you were [at Ditzler's residence], did you have a knife in your possession?
>
> A: Yes.
>
> Q: Where was it?
>
> A: It was in my pocket.
>
> Q: What was your purpose in having the knife?
>
> A: Well, like I said, I was upset, you know, with everything going on, you know, her lying to me and killing my child.
>
> [COUNSEL FOR THE COMMONWEALTH]: Objection.

N.T. Trial, 2/11/19, at 310-11.

After Hogan made reference to the abortion, the Commonwealth argued for a mistrial, which the court ultimately denied after a 45-minute recess. Thereafter, the Commonwealth advised the court that it did not wish for a curative instruction. Thus, the ultimate result was that Hogan was able to place before the jury the fact of Ditzler's abortion and the impact of that abortion on his mental state, and, because the Commonwealth declined a curative instruction, the jury was free to consider that fact during deliberations. Accordingly, the trial court's initial decision to preclude the evidence did not prejudice Hogan. Because the evidence he sought to admit

- 7 -

was, in fact, presented to the jury, his claim is moot and he is entitled to no relief.

Hogan next alleges that the trial court erred in allowing the Commonwealth to refer generally to the existence of two court orders prohibiting Hogan from having any contact with Ditzler at the time of the incident. Specifically, Ditzler had obtained a PFA against Hogan because he had been harassing her via text message. Ditzler had also filed harassment charges against Hogan and, as a condition of his bail, Hogan was prohibited from contacting Ditzler. Both prior to and during trial, defense counsel sought to preclude mention of those orders during the Commonwealth's cross-examination of Hogan. The Commonwealth argued that it should be allowed to cross-examine Hogan regarding the orders for the purpose of challenging his credibility with respect to his claim that he went to Ditzler's house merely to speak with her. The Commonwealth sought to raise doubt that Hogan would risk incarceration for the sake of a mere conversation. The court indicated that it would allow the Commonwealth to cross-examine Hogan on the orders, and the Commonwealth agreed that it would not specify the nature of the orders, but refer to them simply as "court orders" that, if violated, could result in Hogan's incarceration.

In an effort to "blunt the effect" of the jury learning about the orders from the Commonwealth, defense counsel made reference to them during his direct examination of Hogan. On cross-examination, the Commonwealth also referenced the orders after Hogan testified that he had only gone to Ditzler's

residence to talk to her. Hogan now asserts that the Commonwealth's reference to the orders was overly prejudicial, and resulted in an unfair trial.[4] He is entitled to no relief.

Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. *Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009). Evidence is unduly prejudicial when its admission creates a danger "that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial." *Commonwealth v. Ulatoski*, 371 A.2d 186, 192 n.11 (Pa. 1977) (citation omitted).

_____

[4] Hogan also argues on appeal that reference to the orders was cumulative and unnecessary to impeach his claim regarding the purpose of his entry into Ditzler's home, because he admitted he entered the residence unlawfully and subjected himself to criminal prosecution by doing so. However, Hogan did not raise this theory at the motion *in limine* stage or when the issue arose again during trial. "[T]his Court cannot review a legal theory in support of that claim unless that particular legal theory was presented to the trial court." *Commonwealth v. Rush*, 959 A.2d 945, 949 (Pa. Super. 2008); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Accordingly, that claim is waived.

In **Sherwood**, our Supreme Court found that the trial court properly admitted evidence that the defendant had previously struck the child he was on trial for beating to death in order to refute the defendant's self-serving allegations that he did not intend to kill the victim and that he loved her. Similarly, here, evidence of the orders prohibiting Hogan from contacting Ditzler were relevant to refute his assertion that he simply wanted to speak with Ditzler and did not go to her residence with the intention of harming her. Moreover, by allowing the Commonwealth to refer only generically to "court orders," the court limited the possibility of undue prejudice. Accordingly, the trial court did not err in allowing the Commonwealth to cross-examine Hogan regarding the orders.

Finally, Hogan claims that the trial court erred in refusing to dismiss three counts of attempted homicide with which he was charged. Specifically, Hogan argues that he was charged with criminal attempt to commit homicide, generally, rather than criminal attempt to commit first-degree murder. Hogan argues that, "[s]ince [f]irst-[d]egree murder carries an element different from all other degrees of criminal homicide, [a]ttempted [f]irst[-d]egree [m]urder is materially different from the original charge of [a]ttempted [c]riminal [h]omicide" and, thus, amendment of the information should not have been allowed. Brief of Appellant, at 19. The trial court, reasoning that it is impossible to commit attempted second- or third-degree murder, found that Hogan was not misled about what charges he was required to defend and was not prejudiced in the preparation of his defense. We can discern no error.

- 10 -

Due process requires that the criminal information provide fair notice of every crime of which a criminal defendant is accused. ***Commonwealth v. Sims***, 919 A.2d 931, 939 (Pa. 2007). ***See*** Pa.R.Crim.P. 560(C) (providing that "[t]he information shall contain the . . . citation of the statute . . . or other provision of law that the defendant is alleged therein to have violated"). To comport with due process, the notice provided must be sufficiently specific so as to allow the defendant to prepare any available defenses should he exercise his right to a trial. ***Sims***, 919 A.2d at 939, citing ***Commonwealth v. Little***, 314 A.2d 270, 273 (Pa. 1974). Such notice ensures that, if the Commonwealth prevails at trial, the defendant's conviction is not arbitrary or oppressive. ***See Commonwealth v. Kratsas***, 764 A.2d 20, 27 (Pa. 2001).

Here, the criminal information alleged that Hogan, "having the intent to commit [criminal homicide] . . . did intentionally stab" Mallory Geiger, Andrew Matlock and Michael Seltzer with a large knife. ***See*** Criminal Information, 4/30/18, at 1. The information clearly apprised Hogan of the intent element of the charge and set forth the factual basis for the charges. As such, the document provided Hogan with sufficient information to prepare his defense. ***Sims***, ***supra***. Indeed, as the trial court properly noted, one cannot attempt to commit murder of the second or third degree. ***See Commonwealth v. Griffin***, 456 A.2d 171, 177 (Pa. Super. 1983). Thus, there could have been no confusion that the Commonwealth was proceeding under any theory other than that Hogan attempted to commit first-degree murder. Demonstrating his awareness of this fact, Hogan argued in a pre-trial habeas corpus motion

- 11 -

that he did not possess the specific intent to kill Mallory Geiger. Additionally, at the hearing on Hogan's pre-trial motion *in limine*, defense counsel acknowledged that the Commonwealth would present evidence of Hogan's specific intent to kill. Accordingly, Hogan was sufficiently apprised that he was being charged with criminal attempt to commit first-degree murder and the trial court did not err in declining to dismiss the charges.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/10/2020</u>